IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DEMAUREA GRANT,                    )
                                   )
                 Plaintiff,        )
                                   )
        v.                         )        1:15cv75
                                   )
BRAD RILEY, MARC A. NESBITT,       )
and MARVIN B. ANDERSON,            )
                                   )
                 Defendants.       )

**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, District Judge.

Plaintiff Demauera Grant brought this pro se action for damages against three Cabarrus County Sheriff's Office ("CSO") law enforcement officers after he was placed in a three-point restraint for several hours on December 6, 2014, while awaiting trial at the Cabarrus County detention center (jail). Grant alleges violations of the Eighth and Fourteenth Amendments to the United States Constitution as a result of alleged use of excessive force against him; a Due Process claim for Defendants' failure to properly respond to his grievance within the jail; and a negligent supervision claim for failing to supervise his allegedly excessive restraint as well as for failing to properly train detention officers in how to restrain a non-compliant pretrial detainee.

A bench trial was conducted on April 10 and 11, 2018. Grant was represented at trial by counsel through this court's pro bono representation program. Grant testified and called as witnesses

Defendants as well as CSO Officer Clark and CSO Sergeant Brian Almond. Defendants presented the testimony of the following CSO officers: Sergeant Anthony Haynie, Deputy Chris Shackleford, Sergeant Almond, Defendant Marvin Anderson, and Defendant Mark Nesbitt. At the close of Grant's evidence, Defendants moved for judgment on all claims as a matter of law pursuant to Federal Rule of Civil Procedure 50. Grant disavowed any Eighth Amendment claim for cruel and unusual punishment, and the court granted Defendants' motion to dismiss as to any claim arising from alleged failure to properly handle his disciplinary complaint. The court reserved ruling on Grant's remaining claims. Following trial, the court granted the parties ten days to submit additional proposed findings of fact and conclusions of law. Both Plaintiff (Doc. 48) and Defendants (Doc. 49) updated their filings. The case is now ready for decision.

Pursuant to Federal Rule of Civil Procedure 52(a), the court enters the following findings of fact – based upon an evaluation of the evidence, including the credibility of the witnesses, and the inferences that the court has found reasonable to draw therefrom – and conclusions of law. The court finds the testimony of each of the officers to be credible and takes that testimony as true, even where that testimony conflicts with that of Grant. To the extent any factual statement is contained in the conclusions of law, it is deemed a finding of fact as well.

As explained by the following analysis, and after careful consideration, the court concludes Grant has failed to demonstrate that the Defendants are liable under any of his claims for relief.

I.   **FINDINGS OF FACT**

    **A.   Grant's Pre-Incident Conduct**

1.   Defendant Brad Riley is, and was at all relevant times, the Sheriff of Cabarrus County.

2.   Defendant Nesbitt is, and was at all relevant times, a Captain of the Cabarrus County Sheriff's Office who oversaw the Cabarrus County jail.

3.   Defendant Anderson is, and was at all relevant times, a Sergeant of the Cabarrus County Sheriff's Office employed at the Cabarrus County jail.

4.   In August of 2012, Grant and several others escaped from Stonewall Jackson Youth Development Center, a juvenile correctional facility in Cabarrus County, and in doing so assaulted, strangled, and kidnapped correction officer Johnny Hicks, stole various items of his, and stole his car.   The strangulation was so severe that Hicks's hyoid bone was broken.

5.   Grant was arrested for those crimes on August 4, 2012, in Winston-Salem, North Carolina, and detained in the Forsyth County jail.

6.   For his involvement in the above-described activity, Grant was charged in state court with assault by strangulation,

first-degree kidnapping, common law robbery, and larceny of a motor vehicle on October 29, 2012.

7.   On December 4, 2012, Grant was taken to the Cabarrus County jail, where he was to be held until his trial.

8.   On October 27, 2013, Grant was upset, and he threatened to break the sprinkler head in his cell, which would have caused flooding throughout the jail and damage to Grant's property, as well as the property of other inmates.  Grant was told to calm down or he would be put in restraints and taken to a padded cell. Grant continued his aggressive behavior, including kicking his cell door, which created such noise as to prevent inmates from sleeping, and was then placed in leg restraints and moved to a padded cell until he calmed down.

9.   "Lights out" – when many inmates go to sleep – at the Cabarrus County jail is at 10:00 p.m., so any disturbance after that time is particularly concerning to the detention officers.

10.   On February 15, 2014, Grant requested that jail staff separate him from a particular inmate because he did not like that inmate.   Sergeant Almond refused Grant's request and explained that Grant's dislike of the inmate was not a legitimate reason to separate them.  Grant then threatened to stab that inmate in the neck with a pencil, aware that this threat would require the jail staff to separate him from the inmate.

11.   On March 2, 2014, Grant again threatened to break the

sprinkler head in his cell. In response, CSO Sergeant Zeman attempted to restrain Grant to prevent him from doing so. Grant resisted Zeman's attempt at restraint, and Anderson, who was there to assist in the handling of Grant, took Grant to the floor and restrained him. Once restrained, Grant was taken to a padded cell, where he began to kick the cell door. In order to prevent Grant from kicking the cell door, creating a disturbance, and causing harm to himself or property, the officers put Grant in leg restraints.

12. During his time in the Cabarrus County jail and before the incident in question, Grant was involved in multiple incidents of jail misconduct. For example, he was convicted on February 25, 2013, of a January 19, 2013 assault on a detention officer. He was convicted on February 22, 2013, of injury to real property when he decided to pop a jail sprinkler head on January 20, 2013, causing water to discharge, merely because he was unhappy. He was again convicted on May 30, 2014, of popping a sprinkler head on April 30, 2014. On May 23, 2014, Grant was convicted of throwing feces at another inmate on May 10, 2014. Grant was also involved in a number of incidents that were handled according to Cabarrus County jail policy. These include multiple instances of refusal to lock down, physically assaulting officers and other inmates, blocking his cell door to prevent it from being closed, failure to obey orders on multiple occasions, intentionally clogging his

toilet (in addition to that which occurred on December 6, 2014), threatening staff on multiple occasions, and making "jailhouse hooch" (illegal alcohol).

13. On December 3, 2014, Grant appeared in state court on charges that he had made threats against Anderson and was convicted on December 6, 2014.

**B. The Incident**

14. In early November of 2014, Grant was transferred from his cell on the jail's first floor to a corner cell on the fifth floor, as a consequence of his involvement in a fight between inmates.

15. There are televisions on the fifth floor for detainees to watch, but Grant ultimately concluded that his cell provided a less desirable angle for viewing than that of other cells. So, on December 6, 2014, he asked to be moved to a different cell. This request was denied. In retaliation, later that day Grant clogged the toilet in his cell with a sock, aware that the jail's policy required that he be moved when there was no working toilet in a cell.

16. Upon realizing that Grant had clogged the toilet in his cell, CSO Sergeant Hayne and Sergeant Raulston (the detention officer in charge of the fifth floor at the time) moved Grant to a "wet cell" (one with a concrete bed and drain) on the first floor. Shortly thereafter, the officers left Grant in the wet

cell and closed the flap on the cell door, which provided the only way to see into or out of the cell when the door is closed.

17. Around 6:00 p.m. on that same day, Grant began to kick his cell door. Sergeant Raulston directed Grant to calm down. In response, Grant removed his shirt and assumed an aggressive stance, as if prepared to fight. Grant was warned that if he continued to kick the door, he would be taken to a padded cell. Undeterred, Grant continued to kick the cell door. As a result, he was taken to a padded cell. This cell, like all cells in the jail, had a fire suppression sprinkler in it.

18. Once the officers transported Grant to the padded cell, Grant said he would continue to kick the cell door. Grant was warned that if he continued to do so, he would be placed in a three-point restraint.

19. Undeterred, Grant continued to kick the cell door. As a result, Sergeant Haynie decided to place Grant in a three-point restraint.

20. CSO policy provides for the use of three-point restraints only when necessary to protect the inmate, other officers, or property.

21. Grant resisted the officers' efforts to restrain him, shouted at the officers, and managed to wrestle one of the officers into a headlock. Officers Haynie, Raulston, Almond, Payne, Dugenar, and Shackleford, who were all present to respond to

Grant's disturbance, assisted to quell the disturbance and put Grant to the ground. The officers placed Grant in a three-point restraint, meaning that they handcuffed Grant's hands behind his back, wrapped a chain around each of his ankles to restrict his leg mobility, and connected his handcuffs to his ankle chain with another chain that was roughly three feet long. The time was approximately 6:40 p.m.

22. Pursuant to County jail policy, upon application of Grant's restraints, a jail nurse checked them to ensure that they were not too tight or causing any injury.

23. For the duration of Grant's detention in a three-point restraint, a detention officer checked in on him every fifteen minutes to confirm that he did not need medical attention or to have his restraints adjusted. The officers used a scanner assigned to them to record their well-being check-ins on Grant every fifteen minutes. Officers also noted each time they checked in on a "visual sheet" on Grant's door. Grant did not claim to need medical attention at any point during these assessments or while restrained.

24. Within 30 minutes after being placed in a three-point restraint, Grant was able to maneuver his shackled hands to the front of his body for a more comfortable position. From his restrained position he began to kick his cell door intermittently for several hours. Grant's kicking could be seen and heard in the

jail's control room based on the cameras in the jail. During this time, Grant also threatened to "get" Anderson.

25. Pursuant to Cabarrus County jail policy that prisoners not be kept in a holding cell for more than six hours continuously, Sergeant Almond ordered that Grant be temporarily released from his restraints around midnight. While released, Grant stretched his back, used the restroom, drank water, and was given (but declined) the opportunity to walk around. This release lasted approximately ten minutes. While Grant was released, he continued to make threats against Anderson. Further, while released, Grant threated to "do this all night," which Anderson understood to mean that Grant was going to continue to kick the door and possibly break the sprinkler head in his cell.

26. Because of Grant's continued kicking and continued threats against officers of the jail, Sergeant Anderson ordered Grant to be put back in the padded cell and three-point restraint around 12:10 a.m. on December 7, 2014. However, this time the officers handcuffed Grant's hands in front of his body. When the restraints were reapplied, a nurse again checked to ensure that they were not too tight and would not cause injury. Grant did not ask for any medical treatment.

27. After being returned to the padded cell, Grant continued to make threats against Anderson and kick the cell door for approximately one hour.

28. During Grant's restraint after the midnight break, officers continued to check on him every fifteen minutes to ensure that he did not need medical attention.

29. Around 4:30 a.m., Grant was released from his restraints. Upon being released, Grant stated that he was "done," and he was returned to his original cell.

30. At all times during this incident, each of the officers involved in Grant's restraint was aware of Grant's history of property damage and non-compliance when he did not get his way.

31. At no time before or during the incident did Nesbitt or Riley know that Grant was placed in a three-point restraint.

32. At no time did any CSO officer place or continue any three-point restraint as any form of punishment.

33. At no time was there a directive that Grant remain in a three-point restraint for any specific period of time.

**C. Grant's Grievance and Response**

34. On December 8, 2014, Grant filed an internal inmate grievance against Anderson for his role in the restraint. Shortly afterwards, Nesbitt performed a full investigation of the conduct related to Grant's grievance, including review of the reports the involved officers filed as well as a recording of the incident from a camera in the padded cell. Nesbitt's investigation found that the incident "was the result of [Grant] not getting [his] way and acting out, by clogging toilets and kicking doors" and that

none of the actions taken to restrain Grant had been a violation of Cabarrus County jail policy.

35. After Nesbitt reviewed the recording of the incident, the recording was lost during an attempt to transfer it from one computer to another.[1]

36. After he received the results of Nesbitt's investigation, Grant wrote three letters to Riley in an attempt to appeal Nesbitt's decision on his grievance. It is not clear whether Riley ever received these letters, but it is clear that Grant never received a response. However, there is no appeal process from Nesbitt's decision, as he is the highest ranking officer at the Cabarrus County jail and the Sheriff's designee.

37. On May 19, 2015, Grant pleaded guilty to all of the criminal charges against him that were the basis of his detention in the Cabarrus County jail. Shortly afterward, he was transferred to the Marion Correctional Institute.

---

[1] Grant argues that this missing evidence should give rise to an adverse inference. "The application of an adverse inference 'requires a showing that the party knew the evidence was relevant to some issue at trial and that his willful conduct resulted in its loss or destruction.'" Vulcan Materials Co. v. Massiah, 645 F.3d 249, 259–60 (4th Cir. 2011) (citing Hodge v. Wal-Mart Stores, Inc., 360 F.3d 446, 450 (4th Cir. 2004)). The court finds credible Defendants' explanation that they were not served with the complaint for almost 16 months after it was filed and that by the time it was served, the evidence had been lost before any Defendant had notice of the need to preserve it and through no fault of theirs. As such, the court finds that this recording was inadvertently destroyed and the fact that it was not available at trial does not weigh against Defendants. See Vodusek v. Bayliner Marine Corp., 71 F.3d 148, 156 (4th Cir. 1995) ("A party's failure to produce evidence may, of course, be explained satisfactorily.").

38. At trial in this case, Grant testified that he was experiencing ongoing back pain and could engage in only limited activity because of the incident. However, nothing in the record supports this claim, and it appears the only medical treatment that he sought or received following the incident was ibuprofen, an over-the-counter pain reliever.

39. The CSO has used three-point restraints in the past, but they are not used often and are reserved for instances when an inmate may harm himself, others, or property.

40. CSO officers receive significant training, including the following training as relevant to the allegations of this action: a 200-hour detention officer certification course, which covers basic policies and procedures and the use of restraints; 16 hours of yearly ongoing service training, covering a broad range of subjects; and a ten-week onsite field training program where the officers are trained in the policies and procedures of the Cabarrus County jail.

41. No CSO officer was disciplined as a result of Grant's charges or the three-point restraint.

42. At no point prior to trial did any Defendant timely move to dismiss Grant's claim on the merits.[2]

---

[2] Defendants did move to dismiss for insufficient service of process on July 8, 2016 (Doc. 15), but this motion was denied (Doc. 20).

## II.   CONCLUSIONS OF LAW

43.   Grant's complaint was filed pro se.[3]   "While a pro se litigant's pleadings are liberally construed, <u>Gordon v. Leeke</u>, 574 F.2d 1147, 1151 (4th Cir. 1978), a pro se complaint must still contain sufficient facts 'to raise a right to relief above the speculative level' and 'state a claim to relief that is plausible on its face.'"   <u>Adams v. Sw. Va. Reg'l Jail Auth.</u>, 524 F. App'x 899, 900 (4th Cir. 2013) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555, 570 (2007)).   This liberal construction, however, does not permit the court to become an advocate for a pro se litigant or to rewrite his complaint.   <u>Laber v. Harvey</u>, 438 F.3d 404, 413 n.3 (4th Cir. 2006); <u>Gordon</u>, 574 F.2d at 1152–53.

44.   Title 42, United States Code, § 1983 provides a private cause of action for plaintiffs alleging constitutional violations by persons acting under color of state law.   To establish a claim under § 1983, a plaintiff must prove two elements: (1) that the defendant deprived him of a right secured by the Constitution and laws of the United States and (2) that the defendant deprived him of this constitutional right under the color of state statute, ordinance, regulation, custom, or usage. <u>Mentavlos v. Anderson</u>, 249 F.3d 301, 310 (4th Cir. 2001) (citing <u>Adickes v. S.H. Kress &</u>

---

[3] Grant filed his pro se complaint on January 16, 2015.  (Doc. 2.)  On January 27, 2018, attorney William S. Trivette entered an appearance as counsel for Grant, at the request of the clerk of court, pursuant to this district's pro bono program.  The court thanks Mr. Trivette for volunteering his services in this case.

_Co._, 398 U.S. 144, 150 (1970)).  In order for the deprivation of a right to be attributed to the state, it "must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by it or by a person for whom it is responsible" and "the party charged with the deprivation must be a person who may fairly be said to be a state actor."  _Lugar v. Edmondson Oil Co._, 457 U.S. 922, 937 (1982).

45.  Grant's complaint does not allege that the Defendants acted in either their official or individual capacity.  "[W]hen a plaintiff does not allege capacity specifically, the court must examine the nature of the plaintiff's claims, the relief sought, and the course of the proceedings to determine whether a state official is being sued in a personal capacity."  _Biggs v. Meadows_, 66 F.3d 56, 61 (4th Cir. 1995).  One factor indicating that a suit is filed against a defendant in his individual capacity is "the plaintiff's failure to allege that the defendant acted in accordance with a governmental policy or custom, or the lack of indicia of such a policy or custom on the face of the complaint."  _Id._  "Another indication that suit has been brought against a state actor personally may be a plaintiff's request for compensatory or punitive damages, since such relief is unavailable in official capacity suits."  _Id._  The nature of any defenses raised in response to the complaint is also a relevant factor.  _Id._  As qualified immunity is only available in a personal capacity suit,

the assertion of that defense indicates that the suit was brought against a defendant in his individual capacity.  Id.

46.  Careful review of the relevant factors leads the court to conclude that Grant's claims are brought against Defendants in their individual capacities.  First, the complaint makes no mention that the alleged misconduct of any of the Defendants was pursuant to any governmental policy or custom.  Second, Grant has requested $10,000 in compensatory damages from each Defendant.  Third, both at trial and in their trial brief, Defendants raised the defense of qualified immunity.  (Doc. 39 at 10-11.)  As such, the court finds that Grant brought suit against Defendants in their individual capacities.

47.  To the extent the complaint alleges a violation of the Eighth Amendment prohibition against cruel and unusual punishment, Grant disavowed such a claim and did not oppose Defendants' motion to dismiss such a claim or the court's decision to do so.  The court hereby affirms its dismissal of this claim.

48.  The Fourteenth Amendment provides, in part, that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property without due process of law."  U.S. Const. amend. XIV, § 1.

49.  At trial, Grant conceded that there is no case law to support his argument that Defendants' allegedly inadequate

response to Grant's inmate grievance constitutes a Due Process violation. As per the court's ruling at the close of Grant's evidence, the court agrees. Therefore, this claim, to the extent it is alleged, is dismissed. Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994) ("[T]he Constitution creates no entitlement to grievance procedures or access to any such procedure voluntarily established by a state."); Booker v. S.C. Dep't of Corr., 855 F.3d 533, 541 (4th Cir. 2017), cert. denied, 138 S. Ct. 755, 199 L. Ed. 2d 604 (2018), and cert. denied, 138 S. Ct. 755, 199 L. Ed. 2d 604 (2018) ("Adams establishes a clear rule: inmates have no constitutional entitlement or due process interest in access to a grievance procedures.").

50. At trial, Grant conceded that there was no evidence to support any claim that Nesbitt or Riley knew before or during the incident that he was placed in a three-point restraint. The court agrees. Because neither Riley nor Nesbitt had any prior knowledge that Grant was placed in three-point restraint, Grant's failure to supervise claim, to the extent it is properly before the court, lacks merit and will be dismissed.

51. At trial, Grant also argued that Nesbitt and Riley failed to properly train jail officers, but again conceded that there is no direct evidence to support that argument. Defendants argue that no failure to train claim was alleged in Grant's complaint, even when read liberally. (Doc. 43 at 2.) Rather, they argue,

this claim was first raised during the settlement conference, more than three years after the complaint was filed and only weeks before trial, and that it should not be considered. (Id. at 2-4.) In order to succeed on a claim of failure to train against a supervisor, a plaintiff must show that "(1) the subordinates actually violated the plaintiff's constitutional or statutory rights; (2) the supervisor failed to train properly the subordinates thus illustrating a 'deliberate indifference' to the rights of the persons with whom the subordinates come into contact; and (3) this failure to train actually caused the subordinates to violate the plaintiff's rights." Brown v. Mitchell, 308 F. Supp. 2d 682, 701 (E.D. Va. 2004) (citing City of Canton v. Harris, 489 U.S. 378, 388-92)). Assuming (without deciding) that this claim was properly alleged in the complaint, it would fail nevertheless insofar as there is no lack of direct evidence in support of it and in light of the court's finding that Grant's rights were not violated by the conduct of the officers during the incident.

51. Grant also alleges a § 1983 claim against Anderson on the grounds that, as shift supervisor, Anderson imposed an unreasonable force, in violation of the Fourteenth Amendment, against Grant by keeping him in a three-point restraint for approximately ten hours. As the parties agree, to succeed on an excessive force claim under the Fourteenth Amendment, a pretrial detainee must show that a defendant's actions are not "'rationally

related to a legitimate [nonpunitive] governmental purpose' or that '[the actions were] excessive in relation to that purpose.'" Kingsley v. Hendrickson, 135 S. Ct. at 2473-74 (quoting Bell v. Wolfish, 441 U.S. 520, 561 (1979)). To show that the actions were excessive in relation to the legitimate governmental purpose, a pretrial detainee must show that the "force purposely or knowingly used against him was objectively unreasonable." Id. at 2473. A court examines the propriety of the force from the perspective of a reasonable officer on the scene, including what the officer knew at the time. Id. A court must recognize that the state has a legitimate need to manage a confinement facility. Id. (quoting Wolfish, 441 U.S. at 540).

52. In Kinglsey, the Supreme Court provided six factors to guide the analysis of whether the application of force was reasonable: (1) the relationship between the need for force and the amount of force used; (2) the extent of the plaintiff's injury; (3) any effort made by the officer to temper or limit the amount of force; (4) the severity of the security problem at issue; (5) the threat reasonably perceived by the officer; and (6) whether the plaintiff was actively resisting. Id. These factors are not exclusive but serve only to "illustrate the types of objective circumstances potentially relevant to a determination of excessive force." Id. The court therefore considers the totality of the circumstances.

53.  The court finds that the force that the officers applied to Grant, some of which was at the direction of Sergeant Anderson, was not for the purpose of punishing Grant, but for the purpose of preventing harm to Grant, the other officers in the jail, and other inmates; preventing harm to property; and preventing Grant from creating an ongoing disturbance in furtherance of the state's legitimate interest in managing a confinement facility.  These are legitimate governmental purposes for which the restraint was rationally related.

54.  The court finds that the force applied to Grant during the incident, some of which was at the direction of Sergeant Anderson, would not be objectively unreasonable from the perspective of a reasonable officer on the scene, considering the totality of the circumstances and Anderson's knowledge of Grant's past behavior.  First, the officers' use of force was graduated before application of the three-point restraint, and the officers applied only as much force as was warranted given Grant's behavior both during and before the incident.  Grant had an extensive history of kicking doors and breaking sprinkler heads, both of which cause great disturbance and property damage (to the facility as well as to that of other inmates) in the prison, when he did not get his way.  Given this history and Grant's overt threats to kick the door, the three-point restraint was reasonable as a means to limit Grant's ability to damage property or create a

disturbance, especially during the evening hours.  Second, Grant

does not appear to have suffered injury as a result of the event.

Third, Grant was warned on numerous occasions not to kick the door

and to cease his non-compliant behavior.  When Grant was taken to

the padded cell as a result of his continued misconduct, he was

not initially restrained.  It was only because of Grant's decision

to continue kicking his cell door and his continued threats that

he was placed in a three-point restraint, and even then it was

after he had been explicitly warned that he would be placed in a

the restraint if he did not comply.  Fourth, Grant threatened the

officers, had previously threatened to stab another inmate, and

had been convicted of assaulting an officer of the jail, thus

putting jail staff and other detainees at significant risk of

physical harm.  Further, Grant's history of breaking sprinkler

heads and kicking cell doors and his statements that he was going

to continue to kick his cell door made clear to reasonable officers

that he was going to create a significant and ongoing disturbance

in the prison if he was not placed in the restraints.  Fifth,

during his initial restraint, Grant was actively resisting.  In

sum, the force applied during Grant's initial restraint would have

been objectively reasonable from the perspective of a reasonable

officer.  See id.; see also Price v. Dixon, 961 F. Supp. 894, 902–

03 (E.D.N.C. 1997) (holding that keeping an unruly prisoner

handcuffed to his bunk for a period of twenty-eight hours did not

clearly violate the Eighth Amendment protection against cruel and unusual punishment).

55.    The court finds that Grant's second period of restraint, following his brief release from restraint around midnight until approximately 4:30 a.m., would have been objectively reasonable to a reasonable officer in Sergeant Anderson's position.  It was also rationally related to the legitimate governmental purposes of maintaining order and preventing harm to the jail and jailers.  While Grant does not appear to have been actively resisting at this point, he did continue to make threats against Sergeant Anderson and did threaten to "do this all night" while he was briefly released from three-point restraint around midnight on December 6, 2014.  Indeed, Grant continued to kick the door for almost an hour after being returned to the cell after the midnight break.  Given this behavior, and Anderson's knowledge of Grant's past conduct, the decision to return Grant to a three-point restraint would have been objectively reasonable to a reasonable officer in Anderson's position.  See Kingsley, 135 S. Ct. at 2743; see also Price, 961 F. Supp. at 902-03 (E.D.N.C. 1997).  As such, this claim fails.[4]

_____

[4] Defendants argue alternatively that their actions are protected by qualified immunity.  "Qualified immunity is 'an entitlement not to stand trial or face the burdens of litigation.'  The privilege 'is an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.'"  Jiron v. City of Lakewood, 392 F.3d 410, 414 (10th Cir. 2004) (citing Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)).  As such,

## III. CONCLUSION

For the reasons stated, having considered all of Grant's claims, the court concludes he has failed to demonstrate success as to any of them.

IT IS THEREFORE ORDERED that judgment be entered in favor of Defendants and that this action be DISMISSED WITH PREJUDICE.

A separate Judgment will issue.

/s/   Thomas D. Schroeder
United States District Judge

May 14, 2018

---

"qualified immunity questions should be resolved at the earliest possible stage in litigation." Id. (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)).  However, here Defendants did not raise qualified immunity as a defense prior to trial, and in their post-trial briefing they raise it as an alternative ground after addressing the merits.  "Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law could reasonably believe that their actions were lawful." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011).  In determining whether qualified immunity applies, the court "asks first whether a constitutional violation occurred and second whether the right violated was clearly established." Melgar v. Greene, 593 F.3d 348, 353 (4th Cir. 2010).  "If [an officer] did not violate any [constitutional] right, he is hardly in need of any immunity and the [qualified immunity] analysis ends right then and there." Abney v. Coe, 493 F.3d 412, 415 (4th Cir. 2007).  Because the court has found that Defendants have not violated any of Grant's constitutional rights, the qualified immunity question need not be addressed.